UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 1:26-CR-13 |
| v. | ) | |
| | ) | **FACTUAL BASIS** |
| CHARLES "CHIP" L. MILLER, II | ) | |
| | ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

## INTRODUCTORY PARAGRAPHS

### A. The EB-5 Immigrant Investor Program

1.      Congress created the EB-5 Immigrant Investor Program in 1990 to stimulate the United States economy through job creation and capital investment by foreign investors. Under this program, investors are eligible to apply for lawful permanent resident status if they make the necessary investment into a commercial enterprise in the United States that would create or preserve at least ten permanent, full-time jobs for qualified American workers.

2.      Foreign investors must first demonstrate their financial fitness before applying for the EB-5 program. To that end, EB-5 applicants often enter into escrow agreements with a job-creating investment company to hold pledged funds while the applicant completes the EB-5

application process. Once the EB-5 visa is approved, the escrow agent may then release the funds previously pledged by the applicant to the job-creating company for investment.

**B. Entities and Individuals**

3. The Victim, S.S.D., was a native of India who applied for the EB-5 Immigrant Investor Program. The Victim was educated in the United States, having received his bachelor's degree and a master's degree from Stanford University. With the assistance of his family, the Victim pooled together $900,000 to invest in a qualified EB-5 investment project ("the Project") to obtain lawful permanent resident status in the United States.

4. The Project was to build a casino and resort in Las Vegas, Nevada. The Project was projected to create nearly 5,000 American jobs, and thus was pre-approved as an EB-5 investment project. The Victim was one of several EB-5 applicants to invest in the Project.

5. The Defendant, Charles "Chip" L. MILLER, II, at all times relevant to this Factual Basis, resided and did business in the Western District of North Carolina, primarily in Buncombe and Haywood Counties. In January 2020, MILLER contracted with the Project to serve as escrow agent and hold the Victim's $900,000 in escrow until the Victim completed the EB-5 application process. At all times relevant to this Factual Basis, MILLER was associated with the following entities:

      a. Fundaterra Title & Escrow, LLC ("Fundaterra") purported to be an escrow agent company registered in Asheville, North Carolina. MILLER was a member manager. Fundaterra maintained an escrow account at mRv Banks that was used to receive the Victim's $900,000 investment in the Project. Fundaterra also maintained an unrelated checking account at mRv Banks.

      b. Providence Advisory Group, LLC ("Providence") was registered in Orlando, Florida. MILLER was listed as a manager. Providence served as the escrow manager for the Victim's $900,000 investment in the Project, and MILLER served as the escrow agent.

      c. 3Cord Consulting, LLC ("3Cord Consulting") was registered in Asheville, North Carolina. MILLER was listed as a member manager.

      d. 3Cord Lending, LLC ("3Cord Lending") was registered in Asheville, North Carolina. MILLER was listed as a member manager.

      e. Milzone Construction ("Milzone") was registered in Asheville, North Carolina. MILLER was listed as a member manager.

      f. Abundant Labs, LLC ("Abundant Labs") was registered in Canton, North Carolina. MILLER was listed as founder and partner.

2

g. i2Pure Corp and i2 Strategic Solutions (collectively "i2") were registered in Ashburn, Virginia. On an i2 website, MILLER represented himself as the CEO.

## MILLER'S FRAUD SCHEME

6. On or about January 20, 2020, MILLER entered into an escrow agreement with parties involved with the Project. MILLER agreed to act as the escrow agent and hold the Victim's $900,000 investment until the Victim completed the EB-5 application process, and the money could be released for investment in the Project. By the terms of the escrow agreement, MILLER was required to hold the money and not release it until instructed — MILLER was not permitted to use the money for his own purposes.

7. On or about June 2, 2021, the Victim wired his $900,000 EB-5 project investment to Fundaterra's escrow account at mRv Banks. Prior to the Victim's deposit, the Fundaterra escrow account held a total balance of less than $50,000.

8. Almost immediately, MILLER, having devised a scheme or artifice to defraud, and to obtain money by false or fraudulent pretenses, transmitted and caused to be transmitted signals by means of wire communication in interstate commerce, to execute his scheme to steal the money deposited by the Victim. Starting on or about June 6, 2021, and continuing until on or about January 2, 2024, MILLER initiated wire transfers of the Victim's money from the Fundaterra escrow account into the Fundaterra checking account and into other accounts controlled by MILLER.

9. Between June 6 and June 30, 2021, MILLER fraudulently transferred by wire $310,000 from the Fundaterra escrow account into accounts at his affiliated entities, including 3Cord Consulting, 3Cord Lending, Milzone, Abundant Labs, and i2.

10. Between July 1, 2021, and April 27, 2022, MILLER fraudulently transferred by wire an additional $479,000 of the Victim's money from the Fundaterra escrow account. He fraudulently transferred $453,000 of that money into accounts at his affiliated entities, including 3Cord Consulting, Milzone, and Abundant Labs. He fraudulently transferred the remaining $26,000 to a Fundaterra checking account, from which MILLER paid personal expenses to enrich himself.

11. On April 28, 2022, representatives of the Project contacted MILLER via email in his role as escrow agent to authorize the release of the Victim's investment funds for use in the Project. Unbeknownst to the Victim or the Project, MILLER had embezzled and misapplied most of those funds. MILLER ignored the disbursement request (and subsequent follow-up requests) until May 18, 2022, when MILLER began to execute a series of lulling emails, using the transmission of signals by wire communication in interstate commerce, to stall the Project and the Victim because he did not have the escrow funds that he was supposed to be protecting. MILLER continued sending these lulling emails for many months, even though the terms of the escrow agreement required MILLER to disburse the funds in full within ten days of receipt of the demand to do so.

3

12.     On or about May 18, 2022 (the day that MILLER sent the first lulling email), MILLER transferred $150,000 from the Milzone account into the Fundaterra escrow account. This was the first deposit made into the Fundaterra escrow account since the Victim's $900,000 investment deposit on June 2, 2021.

13.     In December 2022 — over seven months after the Project demanded the release of the funds — MILLER made two partial payments from the Fundaterra escrow account. MILLER wired the Project $200,000 on December 15, and then wired an additional $50,000 on December 16.

14.     On or about February 17, 2023, MILLER fraudulently wired another $10,000 from the Fundaterra escrow account into the Fundaterra checking account, and then moved the same amount into the account at 3Cord Consulting.

15.     On or about January 2, 2024, MILLER fraudulently wired another $3,551.67 from the Fundaterra escrow account into the Fundaterra checking account. MILLER then used some of those funds to pay his personal American Express credit card bill, then transferred the remainder to the 3Cord Consulting account.

## INTENDED LOSS AND RESTITUTION

16.     MILLER's intended loss from this wire fraud scheme was more than $550,000 but less than $1,500,000. U.S.S.G. § 2B1.1(b)(1)(H).

17.     The amount of restitution that MILLER owes to the Victim is $603,783.33.


RUSS FERGUSON
UNITED STATES ATTORNEY

DON GAST
ASSISTANT UNITED STATES ATTORNEY

Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis and the Bill of Information in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis and the Bill of Information. I hereby certify that the defendant does not dispute this Factual Basis.

EUGENE ELLISON, Attorney for Defendant

DATED: 4/3/26

4